HARNEY *et al.* v. THE CITY OF ST. LOUIS, *Appellant.*

City of St. Louis: CONTRACT, CONSTRUCTION OF: RENTS FROM
MARKET.   Under the provisions of an ordinance of the city council
of St. Louis, enacted August 1, 1854, " to open Fifth street north of
Biddle street, and to establish the city market," and the contract
entered into thereunder by the mayor of said city and the Harney
estate, whereby the trustee of said estate was to receive a part of
the rents from a market provided for by said ordinance after the
city had been reimbursed for the expense of its erection, the trustee
is not entitled to any part of the rents until the city has been fully
reimbursed from the rents of the "market house" alone without
taking into account the rents for market stands and market wagons
in the streets adjacent to the market house and constituting part of
the market place.

*Appeal from St. Louis Court of Appeals.*

REVERSED.

*Leverett Bell* for appellant.

*Thos. T. Gantt* for respondents.

HENRY, C. J. — In August, 1854, Louis G. Picot, as
trustee for Mary Harney and others, under the will of
Mrs. Anne Biddle, held a parcel of land in the city
of St. Louis described as follows : "Beginning at a
point in the north line of Biddle street, where the east
line of Fifth street produced northward will intersect
the same ; thence northward to a point fifteen feet west-
ward of the central point between the intersection of the
south line of O'Fallon street and the west line of Fifth
street, as established by this ordinance, and the opposite
point in the east line of Broadway, measured on the
course of the south line of O'Fallon street ; thence east-
ward in the course of said south line of O'Fallon street

thirty feet ; thence in a straight line to the intersection of the western line of Broadway and the northern line of Biddle street, and thence to the point of beginning."

On the first of August, 1854, the city council of the city of St. Louis passed an ordinance, "to open Fifth street north of Biddle street, and to establish the city market." The following are the provisions of said ordinance, which we deem it necessary to consider in determining the controversy between the parties in this suit :

"Sec. 2. The western line of Fifth street, northward of Biddle street, shall be a straight line connecting the point where the western line of Fifth street produced northwardly will intersect the northern line of Biddle street, and the point where the western line of Broadway intersects the northern line of United States survey number 1,478. The eastern line of Fifth street shall be coincident with the western side of the market place hereinafter mentioned."

"Sec. 3. A public market house, to be called the city market, shall be established, erected and maintained by the city of St. Louis, as hereinafter provided, so as to cover, as near as may be, all of the following described piece of ground or market place, beginning at a point in the north line on Biddle street, where the east line of Fifth street produced northward will intersect the same ; thence northward to a point fifteen feet westward of the central point between the intersection of the south line of O'Fallon street and the west line of Fifth street, as established by this ordinance, and the opposite point in the east line of Broadway measured on the course of the south line of O'Fallon street ; thence eastward in the course of said south line of O'Fallon street thirty feet ; thence in a straight line to the intersection of the western line of Broadway and the northern line of Biddle street, and thence to the point of beginning ; provided, that at the discretion of the city, the said market house may be squared or rounded at either end, so as to leave,

unoccupied by buildings, the necessary triangles or fragments of said ground ; and provided, also, that at the election of the city, the market may be reduced to the width of twenty-six feet at its northern end.''

" Sec. 4. So soon as said market shall be completed, the stands, stalls, and other parts thereof, shall be rented by the city, and the net rents, issues, and profits thereof, shall be applied to the reimbursing the cost of the construction thereof, to the city of St. Louis, until such cost and interest at the rate of six per cent. per annum, shall have been fully paid out of the said rents, issues, and profits ; and from and after such payments the net rents, issues, and profits of said market, and all its appurtenances and privileges, shall be divided into eight equal parts, whereof five shall be paid to Louis G. Picot, his heirs and assigns, in his and their capacity as trustees under the will of Mrs. Ann Biddle, for the benefit of Mrs. Mary Harney and others, and subject to the powers and trust therein declared, until the termination of said trust estate, and thereafter, to the beneficiaries of said trust, as ascertained and declared by the said will ; and the residue of the said rents, issues, and profits shall be paid into the city treasury for the use of the city of St. Louis.''

" Sec. 7. No tax shall be assessed, levied, or collected by the city of St. Louis, upon any private interest in the market hereby established.''

" Sec. 8. No benefits shall be assessed against such of the owners of property in blocks number five hundred and fifty-six and number five hundred and eighty-two as shall not claim damages for the opening of Fifth street according to the terms of this ordinance, nor shall any such owner as shall not claim damages, who may have leased any part of the ground to be taken for Fifth street, or used as the market, be in any wise liable to contribute towards the payment of any damage sustained by any lessee by reason of such opening.''

" Sec. 9.    This ordinance shall take effect, and the mayor shall proceed to cause the same to be executed upon the written consent of Mrs. Mary Harney to the terms thereof, and on the agreement in writing of the said Mrs. Mary Harney and Louis G. Picot not to claim any damages for the opening of Fifth street, as established by this ordinance, being filed with the city register ; and unless such consent and agreement be filed with the register within sixty days after the approval of this ordinance, then the same shall be null and void."

On the seventeenth day of September, 1855, Washington King, mayor of said city, Louis G. Picot and Mrs. Mary Harney executed an agreement in writing containing substantially the terms specified in said ordinance.    Afterwards, the city of St. Louis proceeded to erect the market house and completed it in 1856.    No account of the rents, issues, and profits received from the market house has ever been rendered by the city to the plaintiffs, although often demanded by plaintiffs. This suit is to compel the city to render such an account and for general relief, plaintiffs alleging that the city has been reimbursed the cost of the erection of said house.    Plaintiffs had a judgment for $23,839.70, which was, on appeal to the St. Louis Court of Appeals, affirmed, *pro forma*, and defendant has appealed to this court.

The question between the plaintiffs and the city is, whether the rents for market stands and market wagons in the streets adjacent to this market house, and constituting part of the market place, are to be considered in determining whether the city has been reimbursed for the cost of the market house and interest thereon, or is she to be reimbursed from the rents, etc., of the market house alone, before the plaintiffs can participate in the rents of the market and its appurtenances.    The lower court adopted the former theory, and, if erroneously, the judgment must be reversed, because the rents, issues,

etc., of the market house alone had not, when the suit was instituted, reimbursed the city the cost of the building and interest.

The controversy turns upon the proper construction of the ordinance, which was incorporated into, and was, substantially, the contract between the parties. The ordinance distinguishes between a market place and a market house, although occasionally the terms are used interchangeably. In section 2 it is provided that: "The eastern line of Fifth street shall be coincident with the western side of the market place hereinafter mentioned." In the next section it is provided that: "A public market house to be called the city market shall be established," etc. Section 4 provides that: "So soon as said market shall be completed, the stands, stalls, and other parts thereof shall be rented by the city." That the word market there means the market house as distinguished from the market place, we think evident. The word "completed" has no application to the market place. That was completed by the ordinance designating the space set apart for the market place, including streets and alleys.

"The stands, stalls, and other parts thereof, shall be rented by the city," and the rents, etc., shall be applied to reimbursing the city the amount of the cost of the market house. Not a word in that section relates to anything but the market house — the building erected by the city — until we come to the provision, "that from and after such payment, the net rents, issues and profits of said market and all its appurtenances and privileges shall be divided into eight parts, of which five are to be paid to Picot as trustee. If the word market, wherever it occurs in this section, has the broad signification contended for by respondents' counsel, its privileges and appurtenances are a part of the market, and need not have been named in order to give respondents the right to participate in the income from them. The omission

of the "appurtenances and privileges" from the clause designating the source from which the city was to be reimbursed, and expressly naming them in the latter clause, specifying in what rents and profits respondents should participate, after the reimbursement of the city should be accomplished, are not without significance. Why adopt a different phraseology in the one case from that employed in the other, if by both the same thing, and only the same thing, was meant? Again, if the word "market" in section four, is to have the broad meaning contended for, then the city must be reimbursed, not only the costs and expenses of erecting the market house, but all her expenses in establishing the market place also. Evidently, this was not in the contemplation of the parties.

The situation of the parties, and their respective relations to the property, will throw some light upon the contract, and may well be considered in construing its provisions. Picot, as trustee, held the land upon which the market house was to be erected. By a former ordinance of the city, approved March 20, 1850, he had been authorized to build a market house upon the ground with the same privileges and rights belonging to other markets in the city, to have all the rents, appoint his own market master, etc. It was to be devoted to public use, and he was to forfeit the rights conferred upon him by the ordinance, if the house was not completed and devoted to public use before the second day of December, 1852. It seems that he did not erect the house, and made the contract in controversy as a substitute for the one contemplated by that ordinance. The ground yielded no income, and the agreement upon which this suit is based, secured to the owners an immense rental, after the reimbursement of the city the money it might expend in erecting the market house, not only giving the owners of the ground five-eighths of the rents of the building itself, but of the appurtenances, stands, and stalls on

property in which they had no interest whatever, and, in addition, exempting their interest from taxation. Their claim now is, that, whenever the city, out of the rents and profits of the other property, constituting, with their ground, the market place, in which they had no interest whatever, added to the rents and profits of the market house, has been reimbursed the cost of the building, their receipt of five-eighths of the rents, etc., should begin.

We do not think that the contract bears such a construction, and, therefore, reverse the judgment and remand the cause. All concur, except Norton, J., who dissents.